[Cite as *State v. Knipe*, 2024-Ohio-2729.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230681 |
| | | TRIAL NO. C-23CRB-6736-A |
| Plaintiff-Appellee, | : | |
| | : | |
| vs. | | *O P I N I O N.* |
| | : | |
| JUSTIN KNIPE, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Municipal Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: July 19, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Sean M. Donovan*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Lora Peters*, Assistant Public Defender, for Defendant-Appellant.

**BERGERON, Presiding Judge.**

{¶1}  A two-year romantic relationship came to a tumultuous conclusion after defendant-appellant Justin Knipe's girlfriend shared her desire to relocate to Columbus to be closer to her family.  Mr. Knipe relapsed and began drinking, and the resulting quarrel culminated in allegations that he had grabbed and choked his girlfriend and slammed her head into a door frame.   Following the affray, Mr. Knipe was charged with domestic violence and obstructing official business.  After a bench trial, he was convicted of domestic violence, sentenced to 180 days in jail with 165 days suspended and 15 days credit for time served, and placed on 11 months of community control.  He now appeals, maintaining that the trial court erred when it found him guilty of domestic violence.  Having carefully reviewed the evidence and the record, we overrule his sole assignment of error and affirm the trial court's judgment.

I.

{¶2}  Mr. Knipe and Mya Gray began dating in early 2021 and moved in together the following year.  But in April 2023, matters quickly soured between the couple when Ms. Gray informed him that she was moving back to Columbus to be closer to her family.  Upset by this news, Mr. Knipe—who had recently become sober after struggles with alcohol—told her that he was going to hit the bottle.  Ms. Gray had to leave, so out of concern for his well-being, she took his identification, hoping to thwart his plan to purchase alcohol.

{¶3}  According to Ms. Gray, when she returned home about an hour later, she found Mr. Knipe drunk in the living room, dancing and listening to music.  As he continued to drink, his volume and crudeness escalated.  She sought help from his family to address his relapse.

{¶4} Worried that he would hurt himself (or her), she collected the knives and the beer in the apartment and locked them in the trunk of her car. When she returned, he was drinking rubbing alcohol while on the phone with his sponsor. She swiftly confiscated the rubbing alcohol and stored it in her trunk. While she was outside, she spoke with Mr. Knipe's father for about an hour. This time, upon her return, she observed Mr. Knipe smashing things. She called his sister to discuss a plan to get him into rehab while she cleaned up the mess. And after she hung up, she instructed him to take a shower and sober up.

{¶5} She decided that she did not want to remain in the shared apartment and began gathering her belongings. When Mr. Knipe stepped out of the shower, she confronted him about inflammatory content that she discovered on his phone, which she believed laid bare a pattern of cheating and lying. He responded by pushing her against the wall and trying to kiss her, but she rebuffed his advances. He then declared that she could not leave, grabbed her, threw her down on the futon, and climbed on top of her. He grabbed her by the neck and began choking her. She testified that she pleaded with him to stop because she couldn't breathe. She wriggled away from him and ran to the bedroom to retrieve her car keys, but he caught up to her, threw her on the ground, climbed on top of her, and choked her again.

{¶6} Again, she managed to push him off. At trial, she claimed that she then ran to leave, but during cross-examination (after body-camera footage of her speaking with officers following the incident was played), she acknowledged that she first tried to collect her belongings—specifically her air fryer—and place them by the front door. He stopped her by pushing her into a closet, prompting her to call 911. As she tried to speak with emergency assistance, he grabbed her neck and slammed her head into the

door frame at least four times. During the call, she yelled out their address and Mr. Knipe's full name to the dispatcher, and she can be overheard calling him a profanity and telling him that "no one wants you in their life." Eventually, she managed to get away from him and fled from the apartment.

{¶7} Colerain Township Police Officer Jack Yelmgren and his partner responded to the domestic violence call and arrived at the apartment complex, discovering Mr. Knipe and Ms. Gray in the parking lot. The officers separated the couple and interviewed them separately. The officers charged Mr. Knipe with domestic violence, a first-degree misdemeanor, in violation of R.C. 2919.25(A) and obstructing official business, a second-degree misdemeanor, in violation of R.C. 2921.31.

{¶8} During the bench trial in November 2023, Ms. Gray, Officer Yelmgren, and Mr. Knipe's father testified. Ms. Gray recounted the evening during which the affray occurred, and generally, her description of the events seemed to match what she had recounted to the responding officers immediately following the incident. But defense counsel cross-examined her on some inconsistencies related to her attempt to collect her belongings prior to fleeing and the confrontation regarding inflammatory materials she discovered on Mr. Knipe's phone. Officer Yelmgren did not recall seeing any marks on Ms. Gray and testified that he would have photographed any visible injuries (and he took no such photographs). He recalled that Mr. Knipe, on the other hand, had a bruise on his left arm, blood above his eyebrow, and a cut on his nose. And finally, Mr. Knipe's father shared that he had invited Ms. Gray to stay with him if something happened, but she did not take him up on his offer.

4

{**¶9**}  The state tendered one exhibit: Ms. Gray's 911 call recording.  During the call, Ms. Gray can first be heard insulting Mr. Knipe and telling him to "get off," move out of her way, and "stop touching me."  Mr. Knipe was whispering at her (but the contents of his whispers are indiscernible).  Eventually, a physical struggle between the two can be heard—Ms. Gray is repeatedly screaming for help and yelling the address and Mr. Knipe's name.  As the sounds of a physical struggle subside, she indicates that Mr. Knipe bashed her head into the door frame and keeps trying to "choke her out."

{**¶10**}  Mr. Knipe tendered five exhibits: two videos of body-camera footage from Ms. Gray's conversation with the responding officers the night of the incident and three photographs of Mr. Knipe's visible marks at the time of his arrest (a bruise, some blood, and a cut).  Mr. Knipe used the body-camera footage to impeach Ms. Gray because the footage contradicted some of her testimony.

{**¶11**}  Ultimately, the court found Mr. Knipe not guilty of obstructing official business but guilty of domestic violence.  The court held a sentencing hearing in December 2023 and imposed a 180-day jail sentence with 165 days suspended and 15 days credit for time served.  Mr. Knipe was placed on 11 months of community control with orders to complete a drug treatment program, abstain from alcohol and all other substances (without a valid prescription), submit to random drug and alcohol screenings, attend treatment or counseling as recommended by probation, pay restitution of $65.65, and avoid any contact with Ms. Gray.  Mr. Knipe now appeals his conviction.

II.

**{¶12}** In his sole assignment of error, Mr. Knipe challenges his domestic violence conviction, asserting that it ran counter to the manifest weight of the evidence. Specifically, he claims the state failed to credibly establish that he caused physical harm to Ms. Gray.

**{¶13}** When this court considers a manifest weight challenge, we sit as the "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 388, 678 N.E.2d 541 (1997). "[W]e review the evidence, the credibility of witnesses, and the entire record." *State v. Bryant*, 2022-Ohio-4108, 201 N.E.3d 482, ¶ 10 (1st Dist.), citing *Thompkins* at 388. We will not reverse the conviction unless "the trial court ' "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." ' " *Id.*, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as against the manifest weight of the evidence should "be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin*, at paragraph three of the syllabus.

**{¶14}** Mr. Knipe was convicted of domestic violence pursuant to R.C. 2919.25(A), which provides, "No person shall knowingly cause or attempt to cause physical harm to a family or household member." He does not contest the fact that Ms. Gray was a family or household member. Instead, he attacks the evidence that the state advanced to show that he caused or attempted to cause her physical harm.

**{¶15}** Physical harm is statutorily defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). Ohio courts have not interpreted physical harm to require a visible injury. *See, e.g.,*

6

*State v. Chapman*, 5th Dist. Stark No. 12CA118, 2013-Ohio-2732, ¶ 21 (holding there was physical harm even though the victim did not sustain any visible physical injury); *State v. Boldin*, 11th Dist. Geauga No. 2007-G-2808, 2008-Ohio-6408, ¶ 39-40 (same). And this court has previously held that testimony that the defendant grabbed the victim's face and caused the victim pain was sufficient to establish physical injury. *See State v. Daniels*, 2018-Ohio-1701, 111 N.E.3d 708, ¶ 36 (1st Dist.).

**{¶16}** Here, Ms. Gray testified that Mr. Knipe choked her, grabbed her, held her down, and slammed her head into a door frame. Like the defendant in *Daniels*, she testified that these actions caused her pain. And further, the trial court found her testimony to be "compelling," noting that while some of her actions may have been inconsistent, "suggest[ing] that a victim is to behave in only one way is, in fact, not what we find through training and experience."

**{¶17}** While Mr. Knipe highlights some inconsistencies in Ms. Gray's testimony (specifically regarding her confrontation regarding the content on his phone and her collecting her belongings rather than immediately trying to flee), her testimony largely aligned with the 911 and body-camera footage. Ms. Gray explained at trial that she was suffering a panic attack (caused by the stress of the evening's events) as she was speaking with the responding officers. And when there is some contradictory evidence presented at trial, a verdict is not against the manifest weight of the evidence simply " ' "because the finder of fact chose to believe the State's [evidence]." ' " *State v. Cook*, 1st Dist. Hamilton No. C-230235, 2024-Ohio-1664, ¶ 39, quoting *State v. Green*, 2023-Ohio-4360, 231 N.E.3d 1, ¶ 136 (3d Dist.), quoting *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16.

**{¶18}** Although the defense raises some concerns about Ms. Gray's credibility, viewing this record through a manifest weight lens, we cannot conclude that the trial court clearly lost its way or created a manifest miscarriage of justice in finding Mr. Knipe guilty of domestic violence. The trial court's credibility finding comports with the weight of evidence in the record. Accordingly, based on these facts, Mr. Knipe's conviction was not against the manifest weight of the evidence.

*        *        *

**{¶19}** In light of the foregoing analysis, we overrule Mr. Knipe's assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

**CROUSE** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.